No. 16,316.

City of Englewood, Colorado *v.* City and
County of Denver et al.

(229 P. [2d] 667)

Decided February 19, 1951.

Mr. M. O. Shivers, Jr., Mr. Worth Allen, Mr. Frederic L. Kirgis, for plaintiff in error.

Mr. J. Glenn Donaldson, Mr. Glenn G. Saunders, Messrs. Holme, Roberts, More, Owen & Keegan, for defendants in error.

Mr. William A. Grelle, Mr. John C. Banks, Mr. Frank L. Moorhead, Mr. Clifford Mills, Mr. Conrad L. Ball, Mr. F. J. Reinhard, Jr., Mr. J. W. Preston, Mr. F. T. Henry, Mr. John W. Metzger, Attorney General, Mr. Allen Moore, Deputy Attorney General, Mr. Paul Hupp, Assistant Attorney General, Amici curiae.

*En Banc.*

Mr. Justice Holland delivered the opinion of the court.

Englewood, a municipal corporation adjoining Denver, relying on either, or both of two causes of action, sought injunctive relief against Denver and its board of water

commissioners from collecting increased water rates from domestic water consumers in Englewood and from requiring the installation of meters until authority for such has been obtained from the Public Utilities Commission of Colorado. The complaint was filed in the district court of Arapahoe county May 25, 1948; venue was changed to the district court of the City and County of Denver, where, upon the issues presented, a declaratory judgment was entered July 30, 1948, dismissing the complaint and each cause of action therein. Thirteen points are specified as grounds for reversal here.

Succinctly stated, Englewood contends that Denver, in the sale of its surplus water to consumers outside its city limits, is operating as a public utility and subject to the jurisdiction of the Public Utilities Commission of Colorado; and further, that Denver is contractually bound under an Englewood ordinance of 1909, to furnish water to such outside Englewood consumers at the prevailing scheduled rates in the city of Denver. Denver vigorously opposes this contention and is supported by the arguments presented by the Colorado Municipal League and a number of its municipal members, appearing by permission of this court as amici curiae. Permission also was granted to the Attorney General, his deputy and assistant, to appear as amici curiae on behalf of the Colorado Public Utilities Commission.

In 1909, and prior thereto, the water needs of Denver were supplied by the Denver Union Water Company, a private domestic corporation, which had acquired water rights and facilities for such service. In 1909, the water company, seeking a right-of-way to convey from outside sources the water which it had acquired for its principal use in supplying Denver, negotiated an agreement with the city council of Englewood, which contractual agreement merged into an ordinance duly passed by the Englewood City Council, known as ordinance No. 109, a copy of which is marked "Exhibit A," attached to and made a part of the complaint, and is as follows:

"Exhibit 'A'
"Ordinance 109

"An ordinance granting to the Denver Union Water Co. the right to lay and maintain a water main or conduit in and along South Broadway and in and along West Oxford Avenue, Oxford Avenue and South Clarkson St.

"Be It Ordained by the City Council of the City of Englewood:

"*Section 1.* The right and privilege is hereby granted to the Denver Union Water Co., its successors and assigns, to lay and maintain a wood stave conduit or water main forty-eight (48) inches in diameter in and along the following streets and avenues in the City of Englewood, to-wit:

"Beginning at the intersection of West Oxford Avenue and South Topeka Court, and thence east along West Oxford Avenue and Oxford Avenue to the eastern boundary line or limits of said City at South Clarkson St. and thence north along South Clarkson St. to the northern boundary line or limits of said City; also the right to lay and maintain a twenty (20) inch conduit or water main beginning at the intersection of South Broadway and Hampton Avenue, and thence running South on South Broadway to the South boundary line or limit of the City of Englewood.

"*Section 2.* The said The Denver Union Water Co. shall lay said water main and conduits beneath the surface of said streets and refill the excavations and leave said streets and avenues in good condition, and the said Company shall be liable to the City of Englewood and the inhabitants thereof for all damages which may occur by reason of excavating for and laying of said water mains.

"*Section 3.* This right of way is granted upon the further condition that permission shall be granted to the inhabitants of the City of Englewood to make connections with said water mains for domestic supply of

water under the Rules and Regulations of the said The Denver Union Water Company, its successors and assigns, which water shall be paid for at the prevailing schedule rates in the City of Denver.

"Passed and approved on the First (1st) day of November, A. D. 1909."

After the passage of this Englewood ordinance, the water company laid its conduits in the streets designated, and until November 1918, permitted residents of Englewood upon "tap applications," to tap the conduits for their private water service, paying the same rates for such water as was being paid by Denver residents.

In 1916, Denver, a home-rule city, organized under Article XX of the Constitution of the state of Colorado, entered into an option with the Denver Union Water Company for the purchase of the latter's water facilities and properties. Following the procedure prescribed by its charter, the matter of authority to purchase the properties of the water company, and the issuance of bonds therefor, was approved by the electorate of the City and County of Denver, and thereafter, by proper conveyances, on November 1, 1918, Denver acquired certain properties of the water company, including the pipe lines and easements located in the city of Englewood. Following the description of the Englewood or Broadway conduit involved in this case, the deed of conveyance contained the following, "Subject to the provisions contained in a certain ordinance, the same being Ordinance No. 109 of the Series of 1909, of the City of Englewood." Englewood alleges and contends that Denver thus acquired title to the rights granted the Denver Union Water Company by the ordinance subject to the obligations contained in the ordinance, supra, and is bound thereby. The City of Denver denies that the system so acquired was subject to any obligation of the water company, and it affirmatively alleges that Denver did not and could not acquire or obligate itself to perform any obligations of the Denver Union Water Company.

It is stipulated and shown that the Denver Union Water Company, and later Denver, upon "tap" applications, with agreed limitations on the service, permitted residents of Englewood to make the connections for domestic supply of water as provided in the ordinance, supra. It is further shown that for two brief periods, about 1945, during a shortage of water supply, Denver denied additional connections by Englewood residents. It is to be borne in mind that all service connections and facilities for the use and convenience of the consumer were made at the expense of the consumer. In 1948, Denver, through its Board of Water Commissioners, notified the Englewood consumers that an increase of thirty per cent in the flat rate for water was being invoked and would prevail until such time as the consumer would install meters. Within reasonable time thereafter, this action was instituted to enjoin the enforcement of the collection of the increased water rates, and further, to require Denver to submit to the supervision and control of the Public Utilities Commission of the State of Colorado. Upon full hearing, the trial court, in thorough and painstaking findings, determined the questions adversely to Englewood, the plaintiff, and entered its judgment accordingly.

In view of the facts stipulated for purposes of the hearing, it is unnecessary to further detail the evidence because the issues present only two questions for our determination, namely: (1) In permitting Englewood residents to tap the water mains as provided in the ordinance and supply them with so-called "surplus" water, is Denver a public utility within the meaning of the definition of a public utility contained in the Public Utility Act of the State of Colorado, chapter 137, '35 C.S.A., and subject to the control of the Public Utilities Commission created thereunder? (2) Is Denver contractually bound relative to the providing of water service and the rates therefor by the ordinance, supra, and

if in violation of such contractual relation, if any, is Englewood entitled to injunctive relief?

While interrelated, each question, standing as an alleged cause of action, requires our determination. Under the facts peculiar to the instant case, and the constitutional provisions and statutes involved, we have no parallel case for precedent or guidance as an expression of this court. Cases from other jurisdictions closely similar are persuasive, although involving different situations in some respects. It is contended by counsel for Englewood that the case of *City of Lamar v. Town of Wiley*, 80 Colo. 18, 248 Pac. 1009, is here controlling in all respects. With this contention we cannot agree, because in that case the city of Lamar had invoked the jurisdiction or control of the Public Utilities Commission and the question of whether Lamar was a public utility in furnishing electricity beyond its border was not an issue, while in the present case, Denver has consistently held itself free from submission to supervision and control of its utilities operations, including the supplying of water to consumers beyond its territorial limits. Further, the Lamar case involved the furnishing of electric current to the neighboring town of Wiley. While we do not pause to explore the field of distinction between supplying water and that of supplying electric current, it may be said that a great distinction would be found to exist. Another Colorado case frequently cited by counsel is that of *Town of Holyoke v. Smith*, 75 Colo. 286, 226 Pac. 158, in which the municipality resisted the control of the Public Utilities Commission on the ground that section 35 of Article V of the Colorado Constitution prohibited supervision or interference with municipal property to the end that the Public Utilities Commission did not have jurisdiction over the internal rates of a municipally owned electric plant, and this court sustained that contention.

Pertinent to the determination here are the following statutes and constitutional provisions:

Colorado Constitution, Article V: "Sec. 35 Delegation of power.—The general assembly shall not delegate to any special commission, private corporation or association, any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes or perform any municipal function whatever."

Chapter 163, '35 C.S.A.: "§22. Supply water to outside consumers.—The incorporated towns and cities of the state of Colorado are hereby empowered to supply water from their water systems to consumers outside of the corporate limits of the said cities and towns; and to collect therefor such charges and upon such conditions and limitations as said towns and cities may impose by ordinance. [L. '11, p. 522, §1; C.L., §8999.]

"§398. Leasing of water by municipal appropriator:— No rights to be vested by reason of.—In the event any municipal appropriator of water having a population of in excess of two hundred thousand (200,000) people shall hereafter lease water not needed by it for immediate use, no rights shall become vested to a continued leasing or to a continuance of the conditions concerning any return water arising therefrom, so as to defeat or impair the right to terminate the leases, or change the place of use; provided, however, that any leasing shall not injuriously affect rights theretofore vested in other appropriators; provided, further, that nothing herein contained shall authorize an appropriator to recapture water for a second use after it has once been used by it. [L. '31, p. 811, §1.]"

Article 8, chapter 137, '35 C.S.A.: "§57. Commission to enforce constitution and laws.—It is hereby made the duty of the commission to see that the provisions of the constitution and statutes of this state affecting public utilities, the enforcement of which is not specifically vested in some other officer or tribunal, are enforced and obeyed, * * *."

To determine whether or not the act of supplying

water to users beyond its territorial limit by Denver becomes that of a public utility and subject to regulation by the Public Utilities Commission, we must consider the nature of the services rendered and the reasons for the existence of such service. Denver's predecessor, the Denver Union Water Company, did not have for its main purpose the supplying of water to Englewood residents and, as stipulated herein, Denver acquired from the Denver Union Water Company that portion of the properties of the company useful for supplying the inhabitants of the City and County of Denver with water. The prime purpose, and we may add, the only purpose, was to supply water to the residents of Denver and the permission granted the Englewood residents by the ordinance, supra, to connect with the corporate lines was, and is, wholly incidental to the main purpose and is strictly a municipal affair. While operating its water system, and serving within its borders, it could more appropriately be termed a "municipal utility" rather than the broad and all inclusive term of "public utility," because within the territorial limits, the word "public" is confined to the citizens of Denver and the service is open to all members of the Denver public who may require it, and who may demand it within the limits of its capacity to serve. It is at once to be seen that the act of supplying water to users beyond the territorial limits under the circumstances here does not impress the business with a public interest, because the outside users in Englewood have no right to demand the service. Englewood was the author of the ordinance under which it claims, and it did not, in the granting of the right to lay water conduits in its streets, exact as a condition therefor that the water company would furnish water to its residents.

Under the conditions presented by the terms of the ordinance, the water company, and Denver, its successor in interest, is not under public duty to furnish water to Englewood at any kind of rates or to furnish water at

all. The question of contractual obligation, if any, awaits our further discussion herein.

 Counsel for Englewood contend that Denver, by allowing sales of its water in Englewood, has dedicated its property to a public use. The fact, apparent from the record, clearly discloses that throughout all the years the permissive use by Englewood residents of water under the ordinance has been upon agreed limitations. The fact that water and the service of its use is usually the subject matter of utility service, does not carry the presumption that all use or service in connection therewith is a dedication to public use. "Dedication is never presumed without evidence of unequivocal intention on the part of the owner." *Niles v. City of Los Angeles,* 125 Cal. 572, 58 Pac. 190; *City of Phoenix v. Kasun,* 54 Ariz. 470, 97 P. (2d) 210.

 In the matter here involved, Denver has acted in its proprietary or quasi-private capacity, as distinguished from the exercise of governmental power beyond the municipal boundary. Even if the pertinent constitutional provision and statute hereinbefore set out were not controlling, this proprietary function would not bring it within the public utility statute, section 3, chapter 137, '35 C.S.A., the applicable part of which is as follows: "Public Utility Defined. — The term 'public utility' when used in this chapter includes every * * * water corporation, person or municipality operating *for the purpose of supplying the public* for domestic, mechanical or public uses * * *." It cannot rightfully be contended that Denver in the operation of its water system is operating for the purpose of supplying Englewood or any other part of the public outside of Denver with water. In its function of acquiring and supplying Denver residents with water, as a municipal function, it is free of the jurisdiction of the Public Utilities Commission or any other commission created by the legislature. In this freedom it has the double constitutional protection, not alone by virtue of Article XX of our state Constitution,

but by section 35 of Article V of the Constitution hereinbefore set out. Section 57 of the statute of 1913 creating the public utilities commission does not give the commission the right to interfere with the enforcement of public utility regulations when such powers are specifically vested in some other officer or tribunal. Indeed, the commission itself has refused jurisdiction in the matter of the furnishing of water service outside its territorial limits by Denver, in holding that Denver's operations in connection therewith are as those of private contractor or lessor. This ruling and order is to be found in *Re City and County of Denver, et al.,* in volume 20, Colorado Public Utilities Reports at page 235. The commission thus exercising the powers conferred upon it by the legislature, passed upon its own jurisdiction in the first instance thereby exercising a judicial function, but not a judicial power. The commission, by its findings and order, seems to distinguish between the leasing of water and the furnishing of a utility service.

We find little need to enter into a lengthy discussion of what is or what is not a public utility, because we would ultimately apply the almost universally accepted test, which summarized is, that to fall into the class of a public utility, a business or enterprise must be impressed with a public interest and that those engaged in the conduct thereof must hold themselves out as serving or ready to serve all members of the public, who may require it, to the extent of their capacity. The nature of the service must be such that all members of the public have an enforceable right to demand it. Application of this test to the facts before us reveals that this extraterritorial supply of water is on a nonutility basis, and in so operating, under express statutory authority, it can collect such charges therefor and make such conditions and limitations as it may impose, all without liability of any vested right for a continued sale or leasing thereof. We find, and so determine, that Denver holds such water as is not needed by it for immediate

use in its proprietary capacity, in which it has a well defined property right; and section 35 of Article V of the Colorado Constitution, supra, withholds from the legislature all power to dedicate to any commission any supervision of this property right, thus precluding any jurisdiction of the Public Utilities Commission. Prior to the enactment of the Utility Commission Act, the legislature in 1911 enacted section 22 of chapter 163, '35 C.S.A., giving incorporated towns and cities the right to supply water from their water systems to consumers outside of their corporate limits. It is contended by Englewood counsel that the 1913 Public Utility Act repealed this law by implication. This argument seems to rest on the general theory that the subsequent 1913 Public Utility Act takes precedence over the prior enactment. It is the universal rule that repeals by implication are not favored. This doctrine may be invoked where a conflict clearly and unavoidably exists. We may rightfully assume that the 1913 Public Utility Act was passed with full knowledge of the existence of the 1911 statute. It may further be assumed that the legislature did not consider the 1913 Act to be on the same subject as the 1911 Act. If such was the legislative assumption, it was correct. The two Acts are not on related subjects and, of course, no repugnancy exists. As will be seen, the 1911 Act, supra, had only to do with the empowering of incorporated municipalities to supply water from their systems to outside consumers upon such rates and limitations as the municipality might see fit to impose; while the 1913 Public Utility Act fixed the control of public utilities. We must believe that the legislature was cognizant of the constitutional limitation placed on the Public Utilities Commission, or any other commission, over municipal corporations. This limitation is based upon the fact that they are municipal corporations. Section 35, Article V, Colorado Constitution, supra. We therefore determine that the two acts are not inconsistent and that

the latter Act does not expressly or impliedly repeal the former.

 It also is the contention of counsel for Englewood, that in the event this court should determine that Denver, in supplying water to consumers outside its territorial limits, is not a public utility and subject to the supervision and control of the Public Utilities Commission, Denver is, nevertheless, bound contractually by the terms and provisions of the Englewood ordinance No. 109, supra.

The trial court correctly found that, "Ordinance No. 109 was not a contract in any ordinary sense, but rather evidence of authority for a right of way. * * *." To support its cause of action, Englewood was burdened to prove that the ordinance was a contract, and not an easement on condition, and further that the contract was not terminated by any breach, and that it was perpetual in term. It was a further condition of the ordinance that permission be granted to the inhabitants of Englewood to make connections with the water mains for domestic supply of water to be paid for at the prevailing scheduled rates in Denver. We see nothing in the ordinance beyond a liability for a termination of a grant of right-of-way if the condition was broken. It certainly cannot be deemed a covenant binding the water company or Denver to perpetual performance. Throughout the long period here involved, virtually all of the water supplied the Englewood residents has been under forms of application for connection with the water mains under limitations which Denver was bound under its charter to impose. The general substance of the limitations was that the Board of Water Commissioners reserved the right to discontinue the service when in its judgment it was for the best interest of the city to do so. All relations between consumers and Denver were on the limited contract basis.

Relative to the contention that a perpetual obligation existed between Englewood and the Denver Union

Water Company, and that when Denver acquired the properties of the private corporation it assumed the burden of this contract, it is to be said that Englewood, as well as Denver, knew the constitutional prohibition against Denver becoming responsible for any liability of any person or corporation, public or private. By the adoption of the Denver Charter, notice was given to all the world that Denver would handle the leasing of surplus water to outside users on an annual basis and entirely subject to the future needs and requirements of the city.

If it could reasonably be argued that the ordinance created a perpetual term and that it was a municipal franchise agreement, Englewood would be now foreclosed by virtue of the twenty-five-year limit placed on such grants by paragraph 69 of section 10, chapter 163, '35 C.S.A.

From the foregoing, it follows that Englewood is not entitled to any of the relief sought by its complaint herein, and if laches has not intervened, its remedy for any alleged or supposed breach of condition is a termination of the easement granted by the ordinance in question. There is ample evidence to support the finding and judgment of the trial court on the facts, and if comment is appropriate, its determination of the questions of law presented is commendably logical and sound. In no aspect of the case do we see any reason to differ with the trial court's findings and judgment and therefore the judgment is affirmed.